Case 1:98-cv-02011-WBH   Document 121   Filed 01/30/03   Page 1 of 14

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta
DLN
JAN 30 2003
LUTHER D. THOMAS, Clerk
By: EPM Deputy Clerk

# United States Court of Appeals

For the Eleventh Circuit

No. 00-15158

District Court Docket No.
98-02011-CV-WBH-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Oct 18, 2002

THOMAS K. KAHN
CLERK

GEORGE M. WEAVER,
D. WILLIAM TINKLER,
ROBERT A. ROHM,

        Plaintiffs-Appellants-
        Cross-Appellees,

versus

ALICE D. BONNER,
CHARLES A. HARRIS,
JOHN A. JAMES,
EARLE B. MAY, JR., individually and in his official capacity as a member of the Georgia
Judicial Qualifications Commission,

        Defendants-Appellees-
        Cross-Appellants,

STATE BAR OF GEORGIA,

        Defendants-Appellees.

A True Copy - Attested:
Clerk, U.S. Court of Appeals
Eleventh Circuit
By: _____
Deputy Clerk
Atlanta, Georgia

Appeal from the United States District Court
for the Northern District of Georgia

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

        Entered: October 18, 2002
        For the Court: Thomas K. Kahn, Clerk
        By: Eggleston, Nataki

ISSUED AS MANDATE
JAN 2 9 2003
U.S. COURT OF APPEALS
ATLANTA, GA

121

George M. WEAVER, D. William Tinkler, Robert A. Rohm, Plaintiffs–Appellants–Cross–Appellees,

v.

Alice D. BONNER, Charles A. Harris, John A. James, Earle B. May, Jr., individually and in his official capacity as a member of the Georgia Judicial Qualifications Commission, Defendants–Appellees–Cross–Appellants, State Bar of Georgia, Defendants–Appellees.

No. 00–15158.

United States Court of Appeals, Eleventh Circuit.

Oct. 18, 2002.

Candidate for election to the Georgia Supreme Court and a registered voter in Georgia sued the Georgia State Bar, the Director of the Georgia Judicial Qualifications Commission (JQC), and members of its Special Committee on Judicial Election Campaign Intervention in both their individual and official capacities, challenging constitutionality of Canons of the Georgia Code of Judicial Conduct and JQC Rule regulating public statements by judicial candidates, and requesting injunctive relief, damages, and a special election. The United States District Court for the Northern District of Georgia, No. 98-02011-CV-WBH-1, Willis B. Hunt, Jr., J., 114 F.Supp.2d 1337, granted summary judgment to plaintiffs in part and to defendants in part, and appeal and cross-appeal were taken. The Court of Appeals, Tjoflat, Circuit Judge, held that: (1) Canon of Georgia Code of Judicial Conduct precluding public communication by a candidate for judicial office is overbroad and violates the First Amendment; (2) speech by judicial candidates is not entitled to less protection than speech by legislative and executive candidates; (3) Canon which prohibits judicial candidates from personally soliciting campaign contributions and from personally soliciting publicly stated support violates the First Amendment; (4) the issuance of a cease and desist request under JQC rule is an impermissible prior restraint on protected expression; (5) individual defendants were entitled to qualified immunity from civil damages; and (6) a special election was not an appropriate remedy.

Affirmed in part and reversed in part.

1. Constitutional Law ⇐90(3)

The "overbreadth doctrine" permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep, and is based on a statute's possible direct and indirect burdens on speech. U.S.C.A. Const. Amend. 1.

See publication Words and Phrases for other judicial constructions and definitions.

2. Constitutional Law ⇐90(3)

The overbreadth doctrine is designed to protect the public from the chilling effect a statute has on protected speech, and the court will strike down the statute even though the governmental entity enforced the statute against those engaged in unprotected activities. U.S.C.A. Const.Amend. 1.

3. Constitutional Law ⇐90.1(1.2)

A candidate's speech during an election campaign occupies the core of the protection

Synopsis, Syllabi and Key Number Classification
COPYRIGHT © 2002 by WEST GROUP

The Synopsis, Syllabi and Key Number Classification constitute no part of the opinion of the court.

192          WEAVER v. BONNER

afforded by the First Amendment. U.S.C.A. Const.Amend. 1.

**4. Constitutional Law** ⇐90.1(1)

The proper test to be applied to determine the constitutionality of restrictions on core political speech is strict scrutiny, under which the government has the burden of proving that the restriction is (1) narrowly tailored, to serve (2) a compelling state interest. U.S.C.A. Const.Amend. 1.

**5. Constitutional Law** ⇐90.1(1.2, 5)
**Judges** ⇐11(1)

Canon of Georgia Code of Judicial Conduct regulating public communications by a candidate for judicial office is not narrowly tailored to serve Georgia's compelling interests of preserving the integrity, impartiality, and independence of the judiciary and ensuring the integrity of the electoral process and protecting voters from confusion and undue influence, and thus is facially overbroad and violates the First Amendment, in prohibiting false statements negligently made and true statements that are misleading or deceptive or contain a material misrepresentation or omit a material fact or create an unjustified expectation about results. U.S.C.A. Const. Amend. 1; Ga.Code of Jud.Conduct, Canon 7(B)(1)(d).

**6. Constitutional Law** ⇐90.1(5)

False statements are not entitled to the same level of First Amendment protection as truthful statements. U.S.C.A. Const.Amend. 1.

**7. Constitutional Law** ⇐90.1(5)

Erroneous statement is inevitable in free debate, and it must be protected if the freedoms of expression are to have the breathing space that they need to survive. U.S.C.A. Const.Amend. 1.

**8. Constitutional Law** ⇐90.1(5)

To be narrowly tailored, restrictions on candidate speech during political campaigns must be limited to false statements that are made with knowledge of falsity or with reckless disregard as to whether the statement is false, i.e., an actual malice standard, and restrictions on negligently made false statements are not narrowly tailored under this standard and consequently violate the First Amendment. U.S.C.A. Const.Amend. 1.

**9. Constitutional Law** ⇐90.1(1.2)

Speech by judicial candidates is not entitled to less protection than speech by legislative and executive candidates. U.S.C.A. Const.Amend. 1.

**10. Constitutional Law** ⇐90.1(1.2)
**Judges** ⇐11(1)

Canon of Georgia Code of Judicial Conduct which prohibits judicial candidates from personally soliciting campaign contributions and from personally soliciting publicly stated support, but allows the candidate's election committee to engage in these activities, violates the First Amendment, as it is not narrowly tailored to serve Georgia's compelling interest in judicial impartiality, since the impartiality concerns, if any, are created by the State's decision to elect judges publicly, and the fact that judicial candidates require financial support and public endorsements to run successful campaigns does not suggest that they will be partial if they are elected. U.S.C.A. Const.Amend. 1; Ga.Code of Jud.Conduct, Canon 7(B)(2).

**11. Constitutional Law** ⇐90.1(1.2)
**Judges** ⇐3

The issuance of a cease and desist request under rule of the Georgia Judicial Qualifications Commission (J… hibits a judicial candidate fr… certain speech, and under … may issue to all media outl… public statement which has th… the government, if a candi… cease and desist request, is a… prior restraint on protect… U.S.C.A. Const.Amend. 1; Ga. cations Commission Rules 27,

**12. Civil Rights** ⇐214(8)

Director of the Georgia … cations Commission (JQC) a… its Special Committee on J… Campaign Intervention we… qualified immunity from civil plication of unconstitutional c… regulating public statements didates, as such unconstituti… clearly established in 1998. … Amend. 1; Ga.Code of Jud.C 7(B)(1)(d), (B)(2); Ga.Judicia Commission Rules 27, 27(b)(4…

**13. Judges** ⇐3

A special election is not remedy for application agai… candidate for a seat on the G… Court of unconstitutional ca… regulating public statements … didates, as voters were not election, nor was there an all… fraud, vote dilution, or a s…

* Honorable John M. Duhé, Jr., L… for the Fifth Circuit, sitting by d…
1. All superior court and state also elected by popular vote. G… § 7, ¶ 1.
2. The JQC was created by cons… ment in 1972, and it was vested to discipline, remove, and caus… tirement of judges." *Id.* art VI,
3. Pursuant to constitutional aut… gia Supreme Court adopted the

al Law ⇔90.1(5)

owly tailored, restrictions on
h during political campaigns
 to false statements that are
/ledge of falsity or with reck-
s to whether the statement is
actual malice standard, and
negligently made false state-
narrowly tailored under this
onsequently violate the First
.S.C.A. Const.Amend. 1.

al Law ⇔90.1(1.2)

udicial candidates is not enti-
ection than speech by legisla-
ative candidates. U.S.C.A.

al Law ⇔90.1(1.2)

(1)

eorgia Code of Judicial Con-
bits judicial candidates from
ing campaign contributions
ally soliciting publicly stated
ows the candidate's election
gage in these activities, vio-
mendment, as it is not nar-
 serve Georgia's compelling
al impartiality, since the im-
ns, if any, are created by the
o elect judges publicly, and
dicial candidates require fi-
and public endorsements to
ampaigns does not suggest
 partial if they are elected.
Amend. 1; Ga.Code of
on 7(B)(2).

al Law ⇔90.1(1.2)

 of a cease and desist re-
e of the Georgia Judicial

Qualifications Commission (JQC) which prohibits a judicial candidate from engaging in certain speech, and under which the JQC may issue to all media outlets a damaging public statement which has the imprimatur of the government, if a candidate violates a cease and desist request, is an impermissible prior restraint on protected expression. U.S.C.A. Const.Amend. 1; Ga.Judicial Qualifications Commission Rules 27, 27(b)(4)(A).

12. Civil Rights ⇔214(8)

Director of the Georgia Judicial Qualifications Commission (JQC) and members of its Special Committee on Judicial Election Campaign Intervention were entitled to qualified immunity from civil damages in application of unconstitutional canons and rule regulating public statements by judicial candidates, as such unconstitutionality was not clearly established in 1998. U.S.C.A. Const. Amend. 1; Ga.Code of Jud.Conduct, Canon 7(B)(1)(d), (B)(2); Ga.Judicial Qualifications Commission Rules 27, 27(b)(4)(A).

13. Judges ⇔3

A special election is not an appropriate remedy for application against the losing candidate for a seat on the Georgia Supreme Court of unconstitutional canons and rule regulating public statements by judicial candidates, as voters were not deprived of an election, nor was there an allegation of voter fraud, vote dilution, or a similar scheme.

U.S.C.A. Const.Amend. 1; Ga.Code of Jud.Conduct, Canon 7(B)(1)(d), (B)(2); Ga.Judicial Qualifications Commission Rules 27, 27(b)(4)(A).

14. Elections ⇔305(9)

Extraordinary circumstances are required to exist before Court of Appeals will overturn state election results and impose a special election.

---

Appeals from the United States District Court for the Northern District of Georgia.

Before TJOFLAT, DUBINA and DUHÉ,* Circuit Judges.

TJOFLAT, Circuit Judge:

I.

A.

Justices of the Georgia Supreme Court are elected by popular vote.[1] Ga. Const., art. VI, § VII, ¶ I. The Judicial Qualifications Commission ("JQC"),[2] operating through its Special Committee on Judicial Election Campaign Intervention ("Special Committee"), monitors these judicial elections for compliance with Canon 7(B) of the Georgia Code of Judicial Conduct.[3] Canon 7(B)(1)(d) provides that candidates for any judicial office that is

---

* Honorable John M. Duhé, Jr., U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. All superior court and state court judges are also elected by popular vote. Ga. Const., art. VI, § 7, ¶ I.

2. The JQC was created by constitutional amendment in 1972, and it was vested with the "power to discipline, remove, and cause involuntary retirement of judges." Id. art. VI, § 7, ¶ VI.

3. Pursuant to constitutional authority, the Georgia Supreme Court adopted the Georgia Code of Judicial Conduct and the Rules of the Judicial Qualifications Commission. See id. art. VI, § 7, ¶ VII; Ga. R. Jud. Qual. Comm'n, intro. Canon 7 of the Code of Judicial Conduct generally prohibits judges from engaging in "[p]olitical [a]ctivity [i]nappropriate to [t]heir [j]udicial [o]ffice." Ga.Code of Judicial Conduct Canon 7. Canon 7(B) specifically addresses the conduct of judicial candidates during election campaigns. Id. Canon 7(B).

**194**          **WEAVER v. BONNER**

filled by public election between competing candidates

> shall not use or participate in the use of any form of public communication which the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation of fact or law or omits a fact necessary to make the communication considered as a whole not materially misleading or which is likely to create an unjustified expectation about results the candidate can achieve.

Ga.Code of Judicial Conduct Canon 7(B)(1)(d). Canon 7(B)(2) provides that judicial candidates "shall not themselves solicit campaign funds, or solicit publicly stated support." *Id.* Canon 7(B)(2). Canon 7(B)(2) further provides that a judicial candidate can establish an election committee to do these solicitations for him. *Id.*

JQC Rule 27 is the mechanism through which the JQC enforces Canon 7 during judicial elections. Rule 27 provides that in every year in which a general election is held, the Chair shall name three JQC members to the Special Committee "whose responsibility shall be to deal expeditiously with allegations of ethical misconduct in campaigns for judicial office." Ga. R. Jud. Qual. Comm'n 27. During judicial election campaigns, the Director of the JQC forwards to the Special Committee all complaints he receives that facially indicate a violation of Canon 7 by a judicial candidate. *Id.* Rule 27(b). If the Special Committee determines after investigation that speedy intervention is warranted, it issues a confidential cease and desist request to the candidate found to be engaging in unethical or unfair campaign practices in violation of Canon 7. *Id.* Rule 27(b)(3). If the cease and desist request is disregarded or if the unethical or unfair campaign practices otherwise continue, the Special Committee is authorized immediately to release to the media a public statement setting out the violations found to exist and the candidate's failure to honor the cease and desist request. *Id.* Rule 27(b)(4)(A).[4]

Standard 74 of the State Bar of Georgia provides that "[a] lawyer who is a candidate for judicial office shall comply with the provisions of the Code of Judicial Conduct applicable to candidates for judicial office. A violation of this Standard may be punished by disbarment."[5] Ga. State Bar R. 4-102 Std. 74.

**B.**

In 1998, George M. Weaver ran for election to the Georgia Supreme Court and was defeated by the incumbent candidate, the Honorable Leah Sears. During his campaign, Weaver distributed a brochure ("first brochure") characterizing Justice Sears's views on same-sex marriage, traditional moral standards, and the electric chair. On June 1, 1998, the JQC received two complaints about Weaver's first brochure. The Special Committee reviewed the complaints and the brochure and concluded that they facially indicated possible violations of Canon 7(B)(1)(d) of the Code of Ju[dicial Conduct.] On June 4, the Special C[ommittee sent] Weaver a letter inviting him [to address] the complaints about his broc[hure's accor]dance with Rule 27(b)(1).[6] A[fter review of] the materials submitted by W[eaver, the Spe]cial Committee concluded that [Weaver's] first brochure violated Canon [7 and] issued a confidential cease and [desist request] on June 11. Specifically, the [Special Com]mittee found the following sta[tements about] Justice Sears in Weaver's fir[st brochure to] be false, misleading, and dece[ptive in viola]tion of Canon 7(B)(1)(d):

> (1) "She would require the [State to recognize] same-sex marriages...."
>
> (2) "She has referred to tr[aditional moral] standards as 'pathetic [and piti]ful.'"
>
> (3) "Justice Sears has calle[d the electric] chair 'silly,'" with the [word "]DEATH PENALTY" i[n a separate] column.

After receiving the confide[ntial cease and] desist request, Weaver rev[ised the bro]chure's language on June 15 a[nd distributed] a second brochure. The revis[ed portion of] the second brochure read in pa[rt:]

> (1) "She has stated that 'i[t is not a] perfect world' because '[same-sex] couples in America cann[ot mar]ry.'"
>
> (2) "When the Supreme C[ourt upheld] traditional moral standa[rds, the] result was 'pathetic and [pitiful].'"
>
> (3) "Justice Sears says sh[e favors the] death penalty but has c[alled the elec]tric chair 'silly.'"

---

4. If the cease and desist request is disregarded, the Special Committee also has the option "to refer the matter to the full Commission for such action as may be appropriate under the applicable rules." Ga. R. Jud. Qual. Comm'n 27(b)(4)(B).

5. Effective January 1, 2001, the Standards of Conduct listed in State Bar Rule 4-102 were replaced by the Rules of Professional Conduct Standard 74 was replaced by Rule 8.2(b), which provides that "[a] lawyer who is a candidate for judicial office shall comply with the applicable provisions of the Code of Judicial Conduct. The maximum penalty for a violation of this rule is disbarment." Ga. State Bar R. 4-102, Rule 8.2(b).

6. Rule 27(b)(1) provides that, [a] copy of the complaint from the J[QC's] Special Committee shall "[s]eek [from the com]plainant and/or the subject of [the complaint...]

ly intervention is warranted,
dential cease and desist re-
didate found to be engaging
unfair campaign practices in
n 7. *Id.* Rule 27(b)(3). If
esist request is disregarded
al or unfair campaign prac-
ntinue, the Special Commit-
l immediately to release to
ic statement setting out the
to exist and the candidate's
he cease and desist request.
(A).[4]

f the State Bar of Georgia
] lawyer who is a candidate
shall comply with the provi-
of Judicial Conduct applica-
*for judicial office.* A viola-
dard may be punished by
a. State Bar R. 4-102 Std.

### B.

e M. Weaver ran for elec-
ia Supreme Court and was
 incumbent candidate, the
 Sears. During his cam-
stributed a brochure ("first
cterizing Justice Sears's
< marriage, traditional mor-
the electric chair. On June
C received two complaints
rst brochure. The Special
ed the complaints and the
icluded that they facially
le violations of Canon

:ules of Professional Conduct.
replaced by Rule 8.2(b), which
lawyer who is a candidate for
ll comply with the applicable
:ode of Judicial Conduct. The
for a violation of this rule is
. State Bar R. 4-102, Rule

7(B)(1)(d) of the Code of Judicial Conduct. On June 4, the Special Committee sent Weaver a letter inviting him to respond to the complaints about his brochure, in accordance with Rule 27(b)(1).[6] After reviewing the materials submitted by Weaver, the Special Committee concluded that portions of the first brochure violated Canon 7(B)(1)(d) and issued a confidential cease and desist request on June 11. Specifically, the Special Committee found the following statements about Justice Sears in Weaver's first brochure to be false, misleading, and deceptive in violation of Canon 7(B)(1)(d):

(1) "She would require the State to license same-sex marriages . . . ."

(2) "She has referred to traditional moral standards as 'pathetic and disgraceful.'"

(3) "Justice Sears has called the electric chair 'silly,'" with the words "THE DEATH PENALTY" in an adjacent column.

After receiving the confidential cease and desist request, Weaver revised the brochure's language on June 15 and distributed a second brochure. The revised language in the second brochure read in part:

(1) "She has stated that 'it is not yet a perfect world' because 'lesbian and gay couples in America cannot legally marry.'"

(2) "When the Supreme Court upheld a traditional moral standard, she said the result was 'pathetic and disgraceful.'"

(3) "Justice Sears says she supports the death penalty but has called the electric chair 'silly.'"

6. Rule 27(b)(1) provides that, after receiving a copy of the complaint from the JQC Director, the Special Committee shall "[s]eek, from the complainant and/or the subject of the complaint,

Weaver and his campaign committee then produced and aired a television advertisement in support of his campaign, which included the following:

(1) The narrator states: "What does Justice Sears stand for? Same sex marriage." This statement is made while a graphic shows: "Same Sex Marriage."

(2) The narrator states: "She's questioned the constitutionality of laws prohibiting sex with children under fourteen." This statement is made while a graphic *shows:* "Questioned Laws Protecting Our Children."

(3) The narrator states: "And she called the electric chair silly." This statement is made while a graphic shows: "Called Electric Chair Silly."

On July 14, the JQC received three complaints about the television advertisement. After reviewing these complaints, the Special Committee concluded that the television advertisement violated its previous cease and desist request regarding the first brochure. On July 15, the Special Committee issued a public statement to the media, in accordance with Rule 27(b)(4)(A), which stated that Weaver had "intentionally and blatantly" violated the original cease and desist request and deliberately engaged in "unethical, unfair, false and intentionally deceptive" campaign practices. In the election held six days later, Weaver was defeated by Justice Sears. On July 3, the JQC forwarded its materials on Weaver to the General Counsel for the State Bar of Georgia for possible disciplinary action under Standard 74.

such further information on the allegations of the complaint as it deems necessary." Ga. R. Jud. Qual. Comm'n 27(b)(1).

**196**   **WEAVER v. BONNER**

C.

On July 16, 1998, one day after the Special Committee issued its public statement, Weaver, joined by John Traylor, a registered voter in Georgia,[7] brought this law suit against the members of the Special Committee and the director of the JQC in both their individual and official capacities. They alleged that Canons 7(B)(1)(d) and 7(B)(2) and Rule 27 unconstitutionally interfere with free speech on their face and as applied to them by the Special Committee, and requested injunctive relief, damages, and a special election. On August 24, 1998, the individual defendants moved the court to dismiss the complaint, contending among other things that, as sued in their official capacities, they were immune from suit under the Eleventh Amendment, and as sued in their individual capacities they were entitled to qualified immunity.

Following some reciprocal discovery, the plaintiffs obtained leave of court to file a second amended complaint, which added the State Bar of Georgia as a party defendant.[8] At the same time, the court addressed the defendants' claims of immunity from suit. On March 16, 1999, the court granted the individual defendants qualified immunity with respect to the plaintiffs' claims for damages, rejected the defendants' remaining grounds for dismissal, and denied the plaintiffs' request for a special election. The court denied that request because plaintiffs had not shown "extraordinary circumstances" that would entitle them to a special election. Specifically, they had not alleged, much less established, that Georgia voters were deprived of an election, nor did they allege voter fraud, vote dilution, or any similar scheme that would require a special election.

After receiving cross-motions for summary judgment, the district court, in an order entered on August 25, 2000, concluded that Canon 7(B)(1)(d) is facially unconstitutional because it "chills" core political speech and violates the overbreadth doctrine by prohibiting false statements of fact made without knowledge or reckless disregard of falsity.[9] The court was not persuaded, however, that Canon 7(B)(2) and Rule 27 violate the First Amendment. In the court's view, both are narrowly tailored to serve the compelling interest of preserving the integrity and independence of Georgia's judiciary.[10] Finally, the court found that the process afforded a candidate standing in Weaver's shoes by Rule 27 is constitutionally adequate.[11] On August 28, 2000, the court entered final judgment, echoing these rulings. The plaintiffs now appeal the district court's rejection of their challenges to Canon 7(B)(2) and Rule 27, their request for a special election, and their claims for damages agai ual defendants in their non-ofl The defendants cross-appea court's decision invalidating C:

II.

[1, 2] The First Amend) that "Congress shall make no ing the freedom of speech... amend. I. This prohibition on the freedom of speech has bee into the Fourteenth Amendn also applies to state governm( breadth challenge is based "possible direct and indirec speech." *United States v. Ac)* 645, 650 (11th Cir.1999) (quot *sellers v. Webb*, 919 F.2d 1. (11th Cir.1990)). The overbr "permits the facial invalidatio inhibit the exercise of Firs rights if the impermissible apr law are substantial when 'jud to the statute's plainly legiti *City of Chicago v. Morales*, 5 119 S.Ct. 1849, 1857, 144 L.E (quoting *Broadrick v. Oklah(* 601, 612–15, 93 S.Ct. 2908, 3 (1973)). The doctrine is desig "the public from the chilling statute has on protected spe( will strike down the statute ex governmental entity enforce against those engaged in unpi ties." *Acheson*, 195 F.3d at *Nationalist Movement v. City* 934 F.2d 1482, 1485 (11th Cir J., dissenting)).

[3, 4] A candidate's spee( election campaign "occupies t protection afforded by the ment." *McIntyre v. Ohio Elec* 514 U.S. 334, 346, 115 S.Ct. 1

---

7. On June 8, 1999, the district court entered a consent order which substituted appellants D. William Tinkler and Robert A. Rohm, also registered voters in Georgia, as co-plaintiffs in place of Traylor.

8. At this point, the plaintiffs were asserting the following claims: Count I, an as applied challenge to Canon 7 and Rule 27 under the First and Fourteenth Amendments; Count II, a facial challenge to Canon 7 and Rule 27 under the First and Fourteenth Amendments; Count III, denial of adequate procedures under Rule 27 in violation of the Due Process Clause of the Fourteenth Amendment; Count IV, a claim that Canon 7 and Rule 27 are invalid under the Due Process Clause of the Fourteenth Amendment because their language is "vague"; Count V, a request for a special election as a remedy for the claims presented in the preceding counts.

9. This ruling disposed of the Count II facial challenge to Canon 7(B)(1)(d) and rendered moot the plaintiffs' Count I as applied challenge to Canon 7(B)(1)(d).

10. These rulings disposed of the Count I and II challenges to Canon 7(B)(2) and to Rule 27

11. This ruling disposed of the Count III and IV due process challenges to Rule 27.

r a special election. The
it request because plaintiffs
xtraordinary circumstances"
e them to a special election.
had not alleged, much less
. Georgia voters were de-
ection, nor did they allege
e dilution, or any similar
ld require a special election.

cross-motions for summary
strict court, in an order en-
. 25, 2000, concluded that
is facially unconstitutional
" core political speech and
readth doctrine by prohibit-
ents of fact made without
ckless disregard of falsity.[9]
ot persuaded, however, that
d Rule 27 violate the First
the court's view, both are
l to serve the compelling
ving the integrity and inde-
rgia's judiciary.[10] Finally,
hat the process afforded a
ng in Weaver's shoes by
itutionally adequate.[11] On
he court entered final judg-
ese rulings. The plaintiffs
district court's rejection of
o Canon 7(B)(2) and Rule
for a special election, and

invalid under the Due Process
urteenth Amendment because
vague"; Count V, a request for
as a remedy for the claims
receding counts.

posed of the Count II facial
n 7(B)(1)(d) and rendered moot
unt I as applied challenge to

disposed of the Count I and II
non 7(B)(2) and to Rule 27.

posed of the Count III and IV
nges to Rule 27.

their claims for damages against the individual defendants in their non-official capacities. The defendants cross-appeal the district court's decision invalidating Canon 7(B)(1)(d).

## II.

[1, 2] The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. This prohibition on laws abridging the freedom of speech has been incorporated into the Fourteenth Amendment so that it also applies to state governments. An overbreadth challenge is based on a statute's "possible direct and indirect burdens on speech." *United States v. Acheson*, 195 F.3d 645, 650 (11th Cir.1999) (quoting *Am. Booksellers v. Webb*, 919 F.2d 1493, 1499–1500 (11th Cir.1990)). The overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago v. Morales*, 527 U.S. 41, 52, 119 S.Ct. 1849, 1857, 144 L.Ed.2d 67 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612–15, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). The doctrine is designed to protect "the public from the chilling effect such a statute has on protected speech; the court will strike down the statute even though the governmental entity enforced the statute against those engaged in unprotected activities." *Acheson*, 195 F.3d at 650 (quoting *Nationalist Movement v. City of Cumming*, 934 F.2d 1482, 1485 (11th Cir.1991) (Tjoflat, J., dissenting)).

[3, 4] A candidate's speech during an election campaign "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346, 115 S.Ct. 1511, 1518, 131 L.Ed.2d 426 (1995). The proper test to be applied to determine the constitutionality of restrictions on "core political speech" is strict scrutiny. *Id.* Under strict scrutiny analysis, the government has the burden of proving that the restriction is "(1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minnesota v. White,* — U.S. —, 122 S.Ct. 2528, 2534, 153 L.Ed.2d 694 (2002); *see also Brown v. Hartlage*, 456 U.S. 45, 53–54, 102 S.Ct. 1523, 1529, 71 L.Ed.2d 732 (1982) ("When a State seeks to restrict directly the offer of ideas by a candidate to the voters, the First Amendment surely requires that the restriction be demonstrably supported by not only a legitimate state interest, but a compelling one, and that the restriction operate without unnecessarily circumscribing protected expression.").

### A.

[5] Appellees contend that Canon 7(B)(1)(d) is narrowly tailored to serve Georgia's compelling interests of "preserving the integrity, impartiality, and independence of the judiciary" and "ensuring the integrity of the electoral process and protecting voters from confusion and undue influence." Appellees' Br. at 33. We disagree.

[6–8] Although Georgia's asserted interests may be compelling, Canon 7(B)(1)(d) is not narrowly tailored to serve those interests because, by prohibiting false statements negligently made and true statements that are misleading or deceptive, Canon 7(B)(1)(d) does not afford the requisite "breathing space" to protected speech. *See Brown*, 456 U.S. at 61, 102 S.Ct. at 1533. It is true that false statements are not entitled to the same level of First Amendment protection as truthful statements. *See id.* at 60, 102 S.Ct.

**198**  **WEAVER v. BONNER**

at 1532 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974)). Moreover, false statements made by candidates during political campaigns "may have serious adverse consequences for the public at large." *McIntyre*, 514 U.S. at 349, 115 S.Ct. at 1529. Nevertheless, "erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.'" *Brown*, 456 U.S. at 60-61, 102 S.Ct. at 1532-33 (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 271-272, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964))(quoting *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)). "The chilling effect of ... absolute accountability for factual misstatements in the course of political debate is incompatible with the atmosphere of free discussion contemplated by the First Amendment in the context of political campaigns." *Id.* at 61, 102 S.Ct. at 1533. Therefore, to be narrowly tailored, restrictions on candidate speech during political campaigns must be limited to false statements that are made with knowledge of falsity or with reckless disregard as to whether the statement is false—i.e., an actual malice standard. *See id.* Restrictions on negligently made false statements are not narrowly tailored under this standard and consequently violate the First Amendment. *See id.* at 61-62, 102 S.Ct. at 1533.

In *Brown*, the Supreme Court held that it was unconstitutional for a Kentucky appeals court to void a county commissioner election after the Kentucky appeals court found that the winning candidate violated the Kentucky Corrupt Practices Act by stating during his campaign that he would work for a reduced salary; unbeknownst to the candidate, this statement was false because the commissioner's salary was fixed by law. *Id.* at 47-52, 60-62, 102 S.Ct. at 1526-28, 1532-33. The Court held that, as applied, the Kentucky Corrupt Practices Act did not afford the requisite "breathing space" to core political speech because it prohibited and punished false factual statements that were made without knowledge of their falsity or reckless disregard as to whether they were false. *See id.* at 61, 102 S.Ct. at 1533. The Court noted that "[i]n a political campaign, a candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent. The preferred First Amendment remedy of 'more speech, not enforced silence,' *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring), thus has special force." *Id.*

On its face, Canon 7(B)(1)(d) has the effect of chilling even more core political speech than the statute that was held unconstitutional in *Brown*. Canon 7(B)(1)(d) not only prohibits false statements knowingly or recklessly made, it also prohibits false statements negligently made and true statements that are misleading or deceptive or contain a material misrepresentation or omit a material fact or create an unjustified expectation about results. *See* Ga.Code of Judicial Conduct Canon 7(B)(1)(d). For fear of violating these broad prohibitions, candidates will too often remain silent even when they have a good faith belief that what they would otherwise say is truthful. This dramatic chilling effect cannot be justified by Georgia's interest in maintaining judicial impartiality and electoral integrity. Negligent misstatements must be protected in order to give protected speech the "breathing space" it requires. The ability of an opposing candidate to correct negligent misstatements with more speech more than offsets the danger of a misinformed electorate that might result from tolerating negligent misstatements.

Moreover, we are not con[vinced that Geor]gia's interest in judicial im[partiality is sub]stantially advanced by Can[on 7(B)(1)(d) be]cause the risks Georgia is co[ncerned with are] not limited to campaign pra[ctices of judicial] candidates. It is the gen[eral practice of] electing judges, not the sp[ecific activity of] judicial campaigning, that [gives rise to im]partiality concerns because [the practice of] electing judges creates motiv[ations for sitting] judges and prospective jud[ges in election] years and non-election year[s alike to do] things that will enhance t[heir chances of] being elected. *See White*, 1[22 S.Ct. at] 2544 (O'Connor, J., concurr[ing) ("I am con]cerned that, even aside fro[m what judicial] candidates may say while c[ampaigning, the] very practice of electing jud[ges undermines] this interest [in preserving j[udicial impartial]ity].... [By choosing to [elect its] judges] ... the State has v[oluntarily taken] on the risks to judicial [bias described] above.... If the State has [a problem with] judicial impartiality, it is [one the] State brought upon itself b[y adopting the] practice of popularly electing [its judges].")

[9] Appellees argue that [even if] a lower standard for judicia[l elections than] for other types of elections [speech by] judicial candidates is ent[itled to less pro]tection than speech by legisl[ative or execu]tive candidates. We disa[gree. Although] there is some support for ap[pellees' position,] *see, e.g., Buckley v. Ill. Judi[cial Inquiry Bd.*,] 997 F.2d 224, 228 (7th Ci[r. 1993) ("judges] remain different from legisl[ators and execu]tive officials, even when all [three are chosen in] ways that bear on the streng[th of the State's] interest in restricting th[eir campaign] speech."), we believe tha[t the Supreme] Court's decision in *White* s[uggests that the] standard for judicial electio[ns is the] same as the standard for legi[slative and exec]utive elections. In *White*, t[he Supreme]

at 1526–28, 1532–33. The
, as applied, the Kentucky
es Act did not afford the
ing space" to core political
it prohibited and punished
ements that were made with-
of their falsity or reckless
hether they were false. *See*
t. at 1533. The Court noted
ical campaign, a candidate's
s unlikely to escape the no-
ection by, the erring candi-
opponent. The preferred
it remedy of 'more speech,
nce,' *Whitney v. California*,
', 47 S.Ct. 641, 648, 71 L.Ed.
ndeis, J., concurring), thus
" *Id.*

non 7(B)(1)(d) has the effect
more core political speech
hat was held unconstitution-
non 7(B)(1)(d) not only pro-
nents knowingly or reckless-
prohibits false statements
and true statements that
r deceptive or contain a ma-
entation or omit a material
an unjustified expectation
ee Ga.Code of Judicial Con-
1)(d). For fear of violating
ibitions, candidates will too
nt even when they have a
hat what they would other-
ful. This dramatic chilling
ustified by Georgia's inter-
g judicial impartiality and

Negligent misstatements
in order to give protected
thing space" it requires.
pposing candidate to cor-
isstatements with more
offsets the danger of a
orate that might result
ligent misstatements.

Moreover, we are not convinced that Georgia's interest in judicial impartiality is substantially advanced by Canon 7(B)(1)(d) because the risks Georgia is concerned with are not limited to campaign practices by judicial candidates. It is the general practice of electing judges, not the specific practice of judicial campaigning, that gives rise to impartiality concerns because the practice of electing judges creates motivations for sitting judges and prospective judges in election years and non-election years to say and do things that will enhance their chances of being elected. *See White*, 122 S.Ct. at 2542, 2544 (O'Connor, J., concurring) ("I am concerned that, even aside from what judicial candidates may say while campaigning, the very practice of electing judges undermines this interest [in preserving judicial impartiality].... [By choosing to popularly elect judges] ... the State has voluntarily taken on the risks to judicial bias described above.... If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.").

[9] Appellees argue that we should adopt a lower standard for judicial elections than for other types of elections because speech by judicial candidates is entitled to less protection than speech by legislative and executive candidates. We disagree. Although there is some support for appellees' position, *see, e.g., Buckley v. Ill. Judicial Inquiry Bd.*, 997 F.2d 224, 228 (7th Cir.1993) ("Judges remain different from legislators and executive officials, even when all are elected, in ways that bear on the strength in the state's interest in restricting their freedom of speech."), we believe that the Supreme Court's decision in *White* suggests that the standard for judicial elections should be the same as the standard for legislative and executive elections. In *White*, the Court struck down Minnesota's "announce clause" which prohibited a judicial candidate from "'announc[ing] his or her views on disputed legal or political issues.'" 122 S.Ct. at 2532 (quoting Minn.Code of Judicial Conduct Canon 5(A)(3)(d)(i) (2002)). In reaching its decision, the Court was not required to decide whether "the First Amendment allows greater regulation of judicial election campaigns than legislative election campaigns" because, even if this were true, the Minnesota law still failed strict scrutiny. *Id.* at 2539. The Court did, however, rely on the standard announced in *Brown* in reaching its decision, *Id.* at 2534–35, and, in his majority opinion, Justice Scalia noted that the difference between judicial and legislative elections has been "greatly exaggerate[d]." *Id.* at 2539. In dissent, Justice Ginsburg argued that "the rationale underlying unconstrained speech in elections for political office—that representative government depends on the public's ability to choose agents who will act at its behest—does not carry over to campaigns for the bench." *Id.* at 2551 (Ginsburg, J., dissenting). Justice Scalia disagreed: "This complete separation of the judiciary from the enterprise of 'representative government' ... is not a true picture of the American system" because "[n]ot only do state-court judges possess the power to 'make' common law, but they have the immense power to shape the States' constitutions as well. Which is precisely why the election of state judges became popular." *Id.* at 2539 (internal citation omitted).

We agree that the distinction between judicial elections and other types of elections has been greatly exaggerated, and we do not believe that the distinction, if there truly is one, justifies greater restrictions on speech during judicial campaigns than during other types of campaigns. We therefore adopt the actual malice standard articulated in *Brown*

200   WEAVER v. BONNER

for regulations of candidate speech during judicial campaigns. As we explained above, Canon 7(B)(1)(d) fails under this standard because it prohibits far more speech than necessary to serve Georgia's compelling interests. We are further persuaded in this regard by the reasoning of *Butler v. Ala. Judicial Inquiry Comm'n*, 802 So.2d 207 (Ala.2001) (*Butler II*), and *In re Chmura*, 461 Mich. 517, 608 N.W.2d 31 (2000), in which the respective states' supreme courts relied on the standard announced in *Brown* to strike down judicial canons that were similar to the one before us.[12] The Alabama judicial canon at issue in *Butler II* was originally before this Court. *See Butler v. Ala. Judicial Inquiry Comm'n*, 245 F.3d 1257 (11th Cir.2001) (*Butler I*). Because there were pending state proceedings before the Alabama Court of the Judiciary, we certified procedural questions to the Alabama Supreme Court to determine whether we should abstain under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Butler I*, 245 F.3d at 1265–66. In lieu of answering the certified questions regarding the ability to challenge the constitutionality of the judicial canon in the Alabama Court of the Judiciary proceedings, the Alabama Supreme Court held that the canon violated the First Amendment because, like the statute in *Brown*, it prohibited false statements negligently made and true statements that a reasonable person would find misleading or deceptive. *Butler II*, 802 So.2d at 218. The court eliminated the language in the canon prohibiting negligent misstatements and misleading true statements so that the canon only applied to knowing or reckless false statements. *Id.* We concluded that the court's narrowing of the canon so that it only applied to knowing or reckless false statements rendered the issue of the canon's facial validity moot. *Butler v. Ala. Judicial Inquiry Comm'n*, 261 F.3d 1154, 1157–58 (11th Cir.2001) (*Butler III*).

### B.

[10] Canon 7(B)(2) also fails strict scrutiny because it is not narrowly tailored to serve Georgia's compelling interest in judicial impartiality. Canon 7(B)(2) prohibits judicial candidates from personally soliciting campaign contributions and from personally soliciting publicly stated support, but allows the candidate's election committee to engage in these activities. In effect, candidates are completely chilled from speaking to potential contributors and endorsers about their potential contributions and endorsements.

The impartiality concerns, if any, are created by the State's decision to elect judges publicly. Campaigning for elected office nec-essarily entails raising cam seeking endorsements from ures and groups in the comn *White*, 122 S.Ct. at 2542 (O curring) ("Unless the pool c dates is limited to those we independently fund their ca cost of campaigning require dates to engage in fundrais that judicial candidates requ port and public endorsement ful campaigns does not sugg be partial if they are electer even if there is a risk thai tempted to rule a particular contributions or endorseme not significantly reduced by a didate's agent to seek the and endorsements on the ca rather than the candidate se self. Successful candidates v to the people who helped t regardless of who did the s port. Canon 7(B)(2) thus fai because it completely chill speech on these topics while ing the state's interest in jud at all.

### C.

[11] The issuance of a R desist request which prohibi didate from engaging in cert impermissible prior restraii expression. "Any system of of expression comes to this heavy presumption against i validity." *Bantam Books*, 1 372 U.S. 58, 70, 83 S.Ct. 631 584 (1963). "The term prior 'to describe administrative ders *forbidding* certain when issued in advance of th communications are to occu

---

12. Michigan's Canon 7(B)(1)(d), which was found unconstitutional in *In re Chmura*, was nearly identical to Georgia's Canon 7(B)(1)(d). It provided that a candidate for judicial office "should not use or participate in the use of any form of public communication that the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially misleading, or which is likely to create an unjustified expectation about results the candidate can achieve." *In re Chmura*, 608 N.W.2d at 36 (quoting Mich. Code of Judicial Conduct Canon 7(B)(1)(d)).

Alabama's Canon 7(B)(2), which was held unconstitutional in *Butler II*, read as follows: "During the course of any campaign for nomination or election to judicial office, a candidate shall not ... [p]ost, publish, broadcast, transmit, circulate, or distribute false information concerning a judicial candidate or an opponent, either knowing the information to be false or with reckless disregard of whether the information is false; or post, publish, broadcast, transmit, circulate, or distribute true information about a judicial candidate or an opponent that would be deceiving or misleading to a reasonable person." *Butler II*, 802 So.2d at 213 (quoting Ala Canons of Judicial Ethics Canon 7(B)(2)).

reasonable person would deceptive. *Butler II*, 802 court eliminated the lan- prohibiting negligent mis- isleading true statements only applied to knowing or ements. *Id.* We conclud- narrowing of the canon so d to knowing or reckless endered the issue of the lity moot. *Butler v. Ala. Comm'n*, 261 F.3d 1154, 001) (*Butler III*).

B.

)(2) also fails strict scruti- not narrowly tailored to pelling interest in judicial n 7(B)(2) prohibits judicial ersonally soliciting cam- and from personally soli- d support, but allows the  committee to engage in n effect, candidates are rom speaking to potential ndorsers about their po- and endorsements.

concerns, if any, are cre- decision to elect judges ng for elected office nec-

'(B)(2), which was held un- *r II*, read as follows: "Dur- ' campaign for nomination office, a candidate shall not padcast, transmit, circulate, rmation concerning a judi- opponent, either knowing alse or with reckless disre- formation is false; or post, smit, circulate, or distrib- bout a judicial candidate ould be deceiving or mis- : person." *Butler II*, 802 Ala. Canons of Judicial

essarily entails raising campaign funds and seeking endorsements from prominent fig- ures and groups in the community. *See, e.g., White*, 122 S.Ct. at 2542 (O'Connor, J., con- curring) ("Unless the pool of judicial candi- dates is limited to those wealthy enough to independently fund their campaigns ... the cost of campaigning requires judicial candi- dates to engage in fundraising."). The fact that judicial candidates require financial sup- port and public endorsements to run success- ful campaigns does not suggest that they will be partial if they are elected. Furthermore, even if there is a risk that judges will be tempted to rule a particular way because of contributions or endorsements, this risk is not significantly reduced by allowing the can- didate's agent to seek these contributions and endorsements on the candidate's behalf rather than the candidate seeking them him- self. Successful candidates will feel beholden to the people who helped them get elected regardless of who did the soliciting of sup- port. Canon 7(B)(2) thus fails strict scrutiny because it completely chills a candidate's speech on these topics while hardly advanc- ing the state's interest in judicial impartiality at all.

C.

[11] The issuance of a Rule 27 cease and desist request which prohibits a judicial can- didate from engaging in certain speech is an impermissible prior restraint on protected expression. "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). "The term prior restraint is used 'to describe administrative and judicial or- ders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Alexander*

*v. United States*, 509 U.S. 544, 550, 113 S.Ct. 2766, 2771, 125 L.Ed.2d 441 (1993) (quoting M. Nimmer, *Nimmer on Freedom of Speech* § 4.03 (1984)). "Temporary restraining or- ders and permanent injunctions—i.e., court orders that actually forbid speech activities— are classic examples of prior restraints." *Id.*

The Supreme Court has consistently rec- ognized a distinction between remedial in- junctions and unconstitutional prior re- straints. For example, in *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), the Supreme Court invali- dated as an unlawful prior restraint a court order that permanently enjoined a newspa- per publisher, who had published articles found to violate a state nuisance statute, from publishing any future "malicious, scan- dalous or defamatory" publications. Similar- ly, in *Vance v. Universal Amusement Co.*, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980), the Supreme Court struck down a Texas statute authorizing courts, upon a showing that obscene films had been shown in the past, to issue an injunction of indefi- nite duration against future exhibition of films that had not been found to be obscene. Also, in *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971), the Supreme Court held that an injunction against distributing leaflets or picketing any- where within city limits was an unconstitu- tional prior restraint because "the injunction operates, not to redress alleged private wrongs, but to suppress [speech] on the basis of previous publications...." *Id.* at 418–19, 91 S.Ct. at 1577.

A Rule 27 cease and desist request is tantamount to an injunction because it is a prohibition on speech by a judicial candidate. If we assume that the JQC can accurately determine whether a statement violates Can- on 7, the cease and desist request is remedial

**202**        **WEAVER v. BONNER**

to the extent that it prohibits candidates from repeating verbatim past statements that the JQC has found to be false, misleading, and deceptive. In reality, however, the cease and desist request is also an unconstitutional prior restraint because it also prohibits *future* statements which, although possibly similar to prior statements, have *not* yet been found to be false, misleading, and deceptive. Weaver's case illustrates this point. Weaver made statements about Justice Sears that the JQC found to be false, misleading, and deceptive. After receiving complaints, the JQC issued a cease and desist request because it determined Weaver's statements were false, misleading, and deceptive. Weaver then altered his statements in an effort to comply with the cease and desist request. The JQC found that these statements were also false, misleading, and deceptive, but instead of issuing a cease and desist request to remedy the new misstatements, the JQC found that these statements were similar enough to the original statements that they violated the original cease and desist request, and it issued a damaging public statement which had the imprimatur of the government. Therefore, as in *Near*, *Keefe*, and *Vance*, the cease and desist request, in addition to prohibiting repetition of past statements found to be false, also prohibited future statements that had not been found to be false when prohibited. Just like the injunctions in those cases, the cease and desist request is an unconstitutional prior restraint on speech.

Weaver continued to speak in the face of the cease and desist request. Most candidates would not. If a candidate violates a cease and desist request, the JQC may issue to all media outlets a damaging public statement which has the imprimatur of the government. *See* Ga. R. Jud. Qual. Comm'n 27(b)(4)(A). The candidate may also be disciplined by the State Bar, and perhaps even disbarred, if the JQC finds that he violated the cease and desist request. *See* Ga. State Bar R. 4-102. These risks, combined with the difficult determination of whether new, similar statements will correct the flaws the JQC found in the candidate's original statement, will lead to a dramatic chilling effect on speech. For these reasons, the JQC has failed to overcome the "heavy presumption" against the cease and desist request's constitutional validity, and we find the cease and desist request to be an unconstitutional prior restraint.

### III.

[12] We find that the district court was correct in determining that defendants were entitled to qualified immunity from civil damages. "Despite their participation in this constitutionally impermissible conduct, [the defendants] may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, ___ U.S. ___, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Although we find today that portions of Canon 7 and the Rule 27 cease and desist request are unconstitutional, we do not believe that this unconstitutionality was "clearly established" in 1998 so that a reasonable person would have known that enforcing these laws was unconstitutional. As late as 2001, we found it unnecessary to intervene in a state proceeding because it was not clearly established that a judicial canon prohibiting false, misleading, and deceptive statements was blatantly unconstitutional. *Butler I*, 245 F.3d at 1265 (finding it unnecessary to intervene in state proceeding because "while we today

make no decision about the of Alabama's judicial canon [Alabama's equivalent of C patently or fragrantly [sic] stitution 'in every clause, se graph, and in whatever ma whomever an effort might k it.' *Younger*, 91 S.Ct. at 75 stitutionality of Canon 7(B) 27 cease and desist request clearly established in 1998. therefore entitled to qualifi their conduct in enforcing

### IV.

[13, 14] We also find th tion is not an appropriate r tiffs' grievances. We requi circumstances to exist befo turn state election results a cial election. For example *Poythress*, 657 F.2d 691, Unit B 1981), the former found extraordinary circum posed a special election whei tal right of the voters was a appointment, rather than ele There are no such extrao stances here. The voters i

---

13. In *Stein v. Reynolds Securi* 33 (11th Cir.1982), this court precedent all decisions of Un

e Bar, and perhaps even QC finds that he violated st request. *See* Ga. State ese risks, combined with nination of whether new, will correct the flaws the candidate's original state- a dramatic chilling effect ese reasons, the JQC has the "heavy presumption" nd desist request's consti- d we find the cease and an unconstitutional prior

### III.

at the district court was ing that defendants were immunity from civil dam- eir participation in this ermissible conduct, [the evertheless be shielded il damages if their actions rly established statutory hts of which a reasonable known.'" *Hope v. Pelzer*, 2 S.Ct. 2508, 2515, 153 (quoting *Harlow v. Fitz-* 00, 818, 102 S.Ct. 2727, 96 (1982)). Although we ions of Canon 7 and the lesist request are uncon- t believe that this uncon- "clearly established" in nable person would have g these laws was uncon- e as 2001, we found it rvene in a state proceed- not clearly established n prohibiting false, mis- ive statements was bla- al. *Butler I*, 245 F.3d at ecessary to intervene in ecause "while we today

make no decision about the constitutionality of Alabama's judicial canons, we doubt that [Alabama's equivalent of Canon 7(B)(1)(d)] patently or fragrantly [sic] violates the Constitution 'in every clause, sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' *Younger*, 91 S.Ct. at 755."). The unconstitutionality of Canon 7(B)(2) and the Rule 27 cease and desist request was likewise not clearly established in 1998. Defendants are therefore entitled to qualified immunity for their conduct in enforcing these state laws.

### IV.

[13, 14] We also find that a special election is not an appropriate remedy for plaintiffs' grievances. We require extraordinary circumstances to exist before we will overturn state election results and impose a special election. For example, in *Duncan v. Poythress*, 657 F.2d 691, 704–08 (5th Cir. Unit B 1981), the former Fifth Circuit[13] found extraordinary circumstances and imposed a special election where the fundamental right of the voters was abrogated by the appointment, rather than election, of a judge. There are no such extraordinary circumstances here. The voters in this case were

---

13. In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

---

not deprived of an election as in *Duncan*, nor is there an allegation of voter fraud, vote dilution, or a similar scheme which would mandate a special election. *See, e.g., Smith v. Cherry*, 489 F.2d 1098 (7th Cir.1973) (reversing dismissal of complaint seeking special election where complaint alleged scheme in which "sham" candidate's name was placed on primary ballot to deceive voters into voting for one candidate when they believed they were voting for another). The voters in this case were free to vote for their candidate of choice. More voters chose to vote for Sears than for Weaver. This does not entitle Weaver or those who voted for him to a special election.

### V.

For the foregoing reasons, we find that the portions of Canon 7 and the Rule 27 cease and desist request at issue in this appeal are unconstitutional; defendants are entitled to qualified immunity; and plaintiffs fail to allege extraordinary circumstances that would require a special election. Accordingly, the orders of the district court are AFFIRMED in part and REVERSED in part.

SO ORDERED.

A True Copy - Attested:
Clerk, U.S. Court of Appeals
Eleventh Circuit

By _____ Deputy Clerk
Atlanta, Georgia